Bland, Chancellor.
This case standing ready for hearing without opposition from the defendants, the solicitor of the plaintiffs was fully heard, and the proceedings read and considered.
The peculiar nature of this case seems to require a more than usually attentive consideration. Putting aside so much of it as relates to the small parcel of land of which the intestate died seized, about which there can be no difficulty; this is the case of a creditors’ bill, in which it appears, that the real estate of the debtor had been taken in execution, during his lifetime, and sold after Ms death, leaving a balance, which even yet remains in the hands of the sheriff whose official term must have since expired, and who has been brought here as a defendant, unassociated with any personal representative of the intestate. These circumstances present a case in which it becomes necessary to determine the extent of the power of the sheriff to follow out, after the death of the defendant, *445 the authority conferred on him by the fieri facias he had previously levied; and if it should appear, that his authority to proceed with the execution was well founded, to ascertain whether the surplus of the proceeds of the sale, so made, is to be considered as real assets to be taken from the hands of the heirs, or to be accounted for as personal assets by an administrator of the intestate ; and also to inquire whether there is any mode in which this court, by any exercise of power within its own legitimate sphere, can compel an officer of another and a superior tribunal to place a fund, now in his hands by their authority, under the direction of this court to be disposed of as prayed by these plaintiffs.
It was a well settled principle of the common law of England, that the real estate of a debtor could not be taken in execution at the suit of a citizen creditor, and sold for the satisfaction of the debt. This rule was considered as a fair and necessary result from the nature of the feudal tenures, according to which all the lands of that country were held. And, as the most liberal species of those tenures was expressly declared to be that by which all the lands of-Maryland should be held, it followed, that real estate could be no further subject to be taken in execution here than the same kind of estate was liable in England.(a)
In the case of the king, however, an execution always issued against the lands as well as the goods of a public debtor; because the debtor was considered as being not only bound in person, but as a feudatory who held mediately or immediately 'from the king; and therefore, holding what he had from the king, he -was from thence to satisfy what he owed to the king. (b) As a consequence of this liability, and for the public benefit, if a judgment was obtained against a public debtor by the king, he thereby acquired a lien upon the real estate of such debtor, which took effect not merely from the date of the judgment, but by relation from the commencement of the suit to the exclusion of all subsequent incumbrances.(c) In England the king’s debt is preferred in execution and in the administration of a deceased’s estate, to that of a citizen; which right of preference was in Maryland extended to the lord proprietary, (d) After our revolution it was held to have devolved, according to thq principles of the common law, upon *446 the State ;(e) and it has been expressly declared, that all lands and tenements belonging to any public debtor, after the commencement *447 of suit against him, shall be liable to execution in whatever hands or possession they may be found.(f) By which legislative enactment the State’s lien, as in England, relates not merely to the date of the judgment, but to the commencement of the action. Whence it follows, that the liability of the real estate of a debtor to the State to be taken in execution, and the lien of the State incident to such liability, are founded upon the common law and the acts of assembly passed in express relation to debts due to the State.
But the general rule of the common law in regard to the liability of real estate to be taken in execution as between party and party, was modified by a statute passed in the year 1285, (g) which made such estates liable to be partially taken in execution. This statute, which gave the writ of elegit, enlarged the remedy of the creditor by declaring, that, when a debt was recovered or damages adjudged, it should be in the election of the plaintiff to have & fieri facias, or to have all the debtor’s chattels and the one half of his lands delivered to him until the debt was levied to a reasonable extent;(h) which gave the election immediately that' the debt was recovered ; and therefore the whole land was held to be' bound from the day of the rendition of the judgment; and those concerned, it was presumed, might easily ascertain from the record by what judgments the lands of the debtor were thus bound, (i) But as some inconvenience arose, because, according to the common law, judgments took effect by relation from the first day of the term, it was in the year 1676 declared by the statute of frauds,(j) that the day on which judgments were rendered should be entered upon the record; and that purchasers should be charged from such time only, and not from the first day of the term whereof the judgment was entered. This then was the nature and extent of the judicial lien, as between party and party, with which the real estate of a debtor might become bound in Maryland as well as in England. And this judicial lien was afterwards mainly fortified and enlarged by a statute passed in the year 1732,(k) applicable only to *448 the then colonies of Great Britain, and received as law in Maryland, which subjected the whole of a debtor’s real estate to be taken in execution and sold for the payment of his debts.
Whence it appears, that the lien arising from the judgments of Dawson and Spencer, at their respective dates, fastened upon the real estate of Jesse Jones, adhered to it after his death, and would have followed it into whosesoever hands it might have passed until they were satisfied, or the right to sue out an execution upon them had become entirely barred. But a judicial lien of this kind may exist after the case has abated by the death of a party; and yet no execution could be immediately issued against the lands upon which it attached, after the death of the party, until the judgment had been regularly revived. And this was in fact the situation of Spencer’s judgments. Hence although it will be necessary, in the further consideration of this case, to recollect the nature and extent of the judicial lien with which the real estate of Jesse Jones had been encumbered during his lifetime; yet the authority of the sheriff to make the sale he did, after the death of Jones, under the fieri facias, issued on Dawson’s judgment, must be deduced from other principles of law.
By the common law o. fieri facias bound the goods of the defendant from its teste, so that any sale made by him, after that time, was void; because it was thought, that, if it were not so, every execution might be avoided by a sale; and it was presumed, that the sheriff would execute such writs immediately; and that there would be thereby such notice in the neighbourhood as to prevent any deception or fraud. But this notion of a retrospective lien, going back to the teste of the writ, was abused; writs were taken out one under another, so as to obtain liens upon the goods of debtors, without delivering them to the sheriff, by which means their sales and all commerce were made uncertain. To prevent which it was declared, by the statute of frauds, that the goods should be bound only from the actual delivery of the writ to the sheriff; by which the old law was, in effect, restored, which supposed the writ to be delivered to the sheriff immediately from the teste. (l)
The mere seizure under the fieri facias does not absolutely os totally divest the defendant of all property in the goods taken; but the sheriff thereby acquires only a qualified property in them; commensurate, however, in all respects, to the performance of the *449 duties assigned him by the writ. He is responsible for the safety of the property, and therefore may have an action against any wrongdoer who attempts to injure it, or to .take it from him. Yet, if before a sale the defendant pays to the sheriff the whole debt and costs, he is bound to redeliver the property so taken in execution. The statute of frauds was intended for the benefit of purchasers and creditors only; therefore, still, as relates to the party himself, the judgment and fieri facias relate to the first.day of the term, or at least to the tesle of the writ; so that if it be tested in the defendant’s lifetime it may be taken out and executed after his death.(m) And so, on the other hand, if the plaintiff dies, after a fieri facias has been sued out, it may nevertheless be executed. And as the writ commands the sheriff to bring the money into court, it is his duty to do so accordingly, so that it may be there deposited to be paid, if the plaintiff be dead, to his executor or administrator, when he shall appear; or, if the defendant be dead, that the surplus, if any, may be paid to his legal representatives when they may come prepared to shew their right to it.(n) Hence it is clear, that this positive command of the writ, virtually and necessarily intercepts the property in its course, and evicts it from the hands of the executor or administrator of the deceased defendant, who died after it bore teste.(o)
These are the well settled principles of law in relation to the personal property of the defendant against whom the fieri facias issued. But, as in England real estate cannot be taken in execution under a fieri facias, there are no English adjudications in relation to a case, like this, where the fieri facias had been levied upon the real estate of the debtor. But, the statute,(p) which subjected lands to be sold for the payment of debts has been so interpreted, and carried into effect here, as to make no distinction whatever between the debtor’s real and personal estate, so far as it may be .affected by any execution bearing teste in his lifetime, (q) And therefore, by analogy to the principles of the English law, applicable to an execution against the personalty, it has been held *450 in this, and in other States, in which this English statute has been received, that by a fieri facias which bears teste, or has been levied, during the lifetime of the defendant, his real estate may be intercepted in its descent and evicted from the hands of his heir; who, if he happens to have obtained actual possession of the estate after the death of his ancestor, will be treated merely as a terre-tenant, whose interest cannot be allowed, in any manner, to retard, or turn aside the execution which had been thus, in fact, or by relation, sued out in the lifetime of the debtor, (r) Whence it clearly follows, that the sale of Jesse Jones’ lands made after his death under the fieri facias issued on Dawson’s judgment was, in all respects, regular and lawful.
The next inquiry is, how far the judicial proceedings, to which the real estate of Jesse Jones has been subjected, have produced a change in its character, or converted it from realty into personalty? And if it has been so converted, then it will become necessary to ascertain the exact point of time at which that very important change was definitively effected.
The writ of fieri facias commands the sheriff to have the money in court, there publicly to pay the party. He may himself pay the plaintiff; but if he does so, it will be at his peril; for he is only perfectly safe in bringing the money into court, according to the express command of the writ. The sheriff cannot deliver the property taken in execution to the plaintiff in satisfaction of his claim; he must sell it and bring in the money. The property of the defendant is to be taken and converted by a sale into money ; and hence, if the judgment be afterwards reversed by writ of error, the defendant shall not be restored to the thing in specie, but the money for which it was sold; for the fieri facias gave the sheriff authority to levy the money of the goods, so that he was obliged to turn the goods of the defendant into money; and therefore, the restitution must be of what the execution had taken from him, which was money, and not the thing itself, for then no body would buy. (s) These are the well settled principles of the common law in relation to personal property taken in execution under a fieri facias ; and the statute having made lands liable to the payment of debts, and subject to the like remedies and process as personal estate, — it follows, upon the same principles, that *451 where lands have been sold, under a fieri facias, they must be considered as having been converted into personalty. So that if the judgment should be afterwards reversed, the title of the purchaser cannot be affected by it; for otherwise there would be no security in purchasing at sheriff’s sales.(t)
Hence the surplus of the proceeds of a sale of lands, as well as of goods, remaining in the hands of the sheriff after a sale made by him under a fieri facias, can only, be viewed as the surplus of that money which he was commanded by the writ to make and bring into court. And hence such surplus must be regarded in all respects as a portion of the personalty of the defendant.
From a case reported, as having been considered and determined by the General Court, it appears that Philemon C. Blake had given two bonds to the State for the performance of his official duties as sheriff; on which the State sued, and having obtained judgments on each of them, issued a fieri facias on the first judgment, and had it levied upon his real estate, which was sold for a sufficiency to satisfy the first judgment, leaving a surplus of £80, which was then in the hands of the defendant. The only question was, whether the State was entitled to a preference from the commencement of the second suit, over any judgments obtained against Blake, after that time. As to which it was held, that upon the State’s obtaining a judgment against its debtor, the act of assembly(u) gave it a lien upon his lands by relation from the commencement of the suit, into whosesoever hands they might come; and therefore, that the State was entitled to have its second judgment satisfied out of the surplus in preference to any judgment rendered after the commencement of its second suit.(v)
The court is reported to have said, in delivering the reasons of their judgment, that “ the surplus of the money arising from the sale of the said Blake’s land, after satisfying the first judgment of the State, remaining in the hands of the defendant, is to be considered as land, and subject to the attachment of the State, issued on the second judgment, in preference to the claim of the plaintiff.”(w)
But the only question was, whether the lien of the State continued to adhere to the proceeds of the sale. Whether they were to be considered as realty or personalty, was, therefore, a matter of no kind of importance; and so it appears from the general tenor *452 of the arguments of the counsel, as well as of the opinion of the court. The question turned upon the construction of the act of assembly as to the continuance of the State’s lien, and nothing more. The point, whether by a sale under a fieri facias, the real estate had been converted into money or personalty, or whether the surplus was to be regarded as real or personal estate, could not have arisen; because either alternative might have been assumed; and, upon the principles laid down, the decision must have been the same; and therefore, this point could not have been in the mind of the court and decided upon in that case. And besides, this act of assembly(x) does, in itself, most manifestly regard the surplus as money or personalty; for, it declares, that the sheriff shall sell the lands to the highest bidder, and shall retain sufficient in his hands to pay the debt and all costs, his own fees included, returning the overplus, if any, to the debtor; that is, he shall from the money, into which the lands have been converted, pay the debt, returning the overplus of that money to the debtor.
There is therefore nothing to be found in that case, when carefully examined, which can be considered as at all at variance with the general and well settled principles of the common law, according to which, in all cases where personal property has been legally sold under a fieri facias, it is held to be made into money ; or, if it be realty, that it is by such sale converted into money, or personalty.
It frequently occurs in this court on creditors’ bills, where the originally suing creditor claims by simple contract, and the land has been sold to satisfy his claim, that there afterwards come in mortgagees or judgment creditors;' in which case the sale stands and is deemed Valid, and their liens are considered as following and binding the proceeds of the sale ; not because those proceeds are held to be realty;. but because no act of any other creditor, or of the court can divest a mortgagee or judgment creditor of his lien upon the lands without giving him a satisfaction, according to the priority of his lien, out of the proceeds of the sale of that land which had been so bound. If, however, in a creditors’ suit against the representatives of their deceased debtor, his lands are sold to pay his debts, leaving a surplus; or if, in a suit by a mortgagee against the heirs of the mortgagor, the mortgaged land is sold to pay the debt, leaving a surplus, in such cases the surplus is con *453 dered as a part of the proceeds of the real assets taken from the heir; therefore, must be paid to him, not to the executor or administrator of his ancestor; and, consequently, can only be taken from him to satisfy other claimants, who may have an equity to be let in, after the distribution, by a special application, under the creditors’ bill, or in'the suit by the mortgagee, upon the ground of the insufficiency of the personal estate of the deceased, (y)
There are other modes, of judicial, proceeding by which real estate may be changed into p'ersonalty, or by which lands may be converted into money or dioses in action. This often occurs under the acts of assembly directing the course of descents; according to which, where the lands of an intestate are. incapable of being divided among his heirs without loss, they may, on application to the proper court of law, be ordered to be sold, and the proceeds of the sale, or the bonds of the purchaser, divided among the heirs. But, the exact point of time when the judicial proceeding, instituted for that purpose, had effected a change in the nature of the property, was considered as a most interesting question in its consequences to the relative rights of the parties. As to which it was held, after mature deliberation, that the mutation of the estate, from real to personal, may be determined to be complete when the commissioners’' sale is ratified by the court, and the purchaser has complied with the terms of it, by paying the money, if the sale is for cash, or by giving bonds. to the representatives, if the sale is on a credit, (z)
According to this rule, the mutation, from realty to personalty, can only be finally consummated by a series of separate and distinct acts : first, there must be a judgment or judicial authority-given by the court to sell; secondly, the commissioners, or agents employed to make the sale, must have reported to the court, that they had, in pursuance of that authority, made a sale ; thirdly, the court must have ratified the sale so made and reported; and lastly, the-purchaser must have either paid the purchase money or have given his bonds to secure the payment of it to the party entitled. When all these acts have been done, the judicial function of the court, in relation to the subject, has finally terminated ; and the fund which had been submitted to its operation has been, thereby, *454 changed from one kind of property into another; from real into personal estate.
With regard to the mutation of the estate, the rule in equity seems to be different; or, at least, it appears to have been held, that all four of those several acts are not essentially necessary to produce a conversion of the property from realty to personalty. For, where, on a bill in chancery to obtain a partition of the real estate of an intestate among his heirs, one of whom was then a feme covert; on the lands being deemed incapable of division, a decree was passed ordering them to be sold; and the trustee, appointed for that purpose, reported, that he had sold them accordingly ; which sale was finally ratified by the court. After which, and before the purchase money had been paid, and before any order had been passed by the court, directing the manner in which the purchase money should be distributed, the feme covert died; and then her husband died. Upon which the interest of the feme covert, at the time of her death, was viewed in the nature of an equitable chose in action ; her individual legal estate in the realty having been changed by the decree, the sale, and the ratification thereof, into a floating undivided interest of that kind.
Hence it appears, that, in equity, the mutation is effected by the mere preliminary operations of the court, or by those judicial proceedings which are always had as preparatory only to that 'partition of the property among the parties which is the sole object of the suit. And it was further held, that although the husband was a party to the suit, yet he could not be considered as having, by those proceedings alone, reduced this interest of his wife’s into possession; because the proceeding only directs a sale of the property, and the proceeds to be brought into court. It professes not to ascertain the rights of the respective claimants; it makes no distribution, it awards no payment, either immediately or contingently, to husband and wife, or either of them ; no such decree has passed as is equivalent to a judgment at law, which would vest the chose of the wife absolutely in the surviving husband; nor has any order been passed by the court directing the proceeds to be paid to the husband and wife, or to the husband alone. And therefore, although the real estate of the wife had been converted into an interest in the nature of an equitable chose in action, that is, into mere personal property of that description; yet, as the husband had not reduced it into possession during his lifetime, it passed to the *455 personal representatives of the late feme covert, not to those of her deceased husband, (a)
A married woman, who is entitled to an undivided part of a real estate, cannot be, in any way, deprived of it without her express consent; which, by the common law, can only be obtained by a fine, or, under the acts of assembly, by her privy examination and acknowledgment of a deed conveying it to another. From necessity, and for the purpose of effecting a partition of a real estate, which is incapable of division without loss, it may be sold and converted into personalty. But a change of the nature of property, in order to attain ¿particular object, should not divest the owner of his right to it, to any extent whatever. The conversion of a real estate into personalty, for the purpose of thereby awarding to a feme covert, more fully and exactly than could otherwise be done, her due share of it, ought not to be allowed to operate so as to impair her right to it, or to lessen her absolute control over it in any way whatever. When a married woman petitions for, or consents to have a partition made of a reál estate, in which she -is entitled to an undivided interest, and acquiesces in a sale of it, for the purpose of making a just division of its value, because of its being difficult, or impracticable to make a correct partition of it in kind without mutual loss, she ought not to be considered as hav • ing, thereby, virtually agreed to have her own absolute right to her share transferred to another, or in any way lessened or impaired. For if that were the effect of the judicial proceeding, then the inevitable consequences of a suit for a partition, in all such cases, would be, that the suit itself would operate as a partial or total extinguishment of the rights and interest of the feme covert. Because, if, by a sale, for the purpose of effecting a partition, the wife’s share is thereby converted into personalty, which her husband may, at pleasure and without her consent, reduce into possession, the result will be, that she may thus be divested of her real estate without her express consent; and even if the husband were allowed so to take the wife’s share as personalty, subject to what is called the wife’s equity, then she could only have a portion of it settled upon her; whereas the whole of the proceeds of sale awarded to her are, in truth, but the substitute for her realty; and therefore, to do her justice, the *456 whole should be settled upon her as land; unless she should expressly consent that the proceeds of sale should be otherwise disposed of.(a)
*457 It may well be doubted, whether it is within the constitutional competency of either the legislative, or judicial department of our *458 government to pass any law, or to do any act which shall result in thus divesting any one of his property, or impairing his rights without his express consent. It is a general rule of law, -from which no court of justice should permit itself to deviate, that no citizen can, in any way, be deprived of his property without his consent ; or otherwise than as a punishment; or as a means of compelling him to pay his debts, and comply with his contracts. If, being competent to consent, he refuses to allow his property to be applied to a public purpose, it cannot, even in that case, be taken from him without an adequate compensation. But, if the owner be incompetent to contract, or to manage his own affairs, a court of justice never undertakes, even to alter the nature of his property from realty to personalty, or the reverse; except from necessity and for his obvious advantage.(b) So too, although this court has been expressly authorized, by various acts of assembly, for the benefit of an infant, or person non compos mentis, to have his real estate sold and converted into personalty; yet, as he can give no consent to any such conversion, it is but just, that his rights and interests should be no further deranged or impaired than may be indispensably necessary; therefore, it has been expressly declared, that the proceeds of the sale of the real estate shall, in such cases, pass as realty to the heirs of such infant or person non compos mentis, as if no such sale had been made.(c)
An obvious consequence of this mutation of a wife’s real estate into personalty, is, that it casts over the property thus changed, by what seems to be considered as the tacit consent or acquiescence *459 of the wife, (but certainly without her privy examination or express assent,) all the law which regulates personal property belonging to the wife. As land, her husband could have only a limited and qualified right to and enjoyment of it; she could not be deprived of it without her solemn, free, and express consent, which if not given, it would after her death pass to her heirs; but as personalty, on being reduced into possession by the husband, it becomes absolutely his property, and may be wasted or disposed of by him without any control from her.(d) But subject to these principles in regard to the mutation of the property itself, the Court of Appeals has distinctly recognised the existence of that right of a feme covert in regard to her property which her husband may ask a court of equity to put into his hands, called “the wife's equity;" and which can only be secured to her by a court of equity.(e) In relation to which, it has been laid down, that where a husband comes into equity to obtain any of his wife’s choses in action, the court will not receive her consent to bar her equity, until after the amount due to her has been ascertained; for, though she may not think $500 the proper subject of a settlement, she may think differently of $5,000. (f)
But although, in-general, choses in’action are not subject to be taken in execution, either at law, or in equity; yet this interest, which has been held to be in the nature of an equitable chose in action, will be so far considered' as parcel of the realty as to be subject to be intercepted by an order of this court for the benefit of the creditors of the deceased debtor where his personalty has been exhausted, or where the heir to whom it has been awarded is the debtor and is beyond the jurisdiction of the State.(g)
The rules thus laid down upon this subject must however, as it would seem, be received with some qualification. The six heirs of an intestate instituted proceedings at law to have the real estate, which they claimed by descent, divided among them; on the commissioners having made return of its value, and that it would not admit of a division without loss; one of them elected to take the whole, at the valuation. After which, the elector having failed to pay the valuation, one of the heirs, who had not been satisfied, brought an ejectment, for his one undi *460 vided sixth part of the land descended, against the elector. Upon which it was held, that a legal estate in fee, in the land elected to be taken, cannot vest in the party electing to take, and pay the value, without his actually paying the persons entitled their just proportions of the value in money, or giving bonds to them for the same agreeably to the act of assembly. (h) Whence it would seem, that although the elector may be regarded as a purchaser; yet, by his election alone, the estate is not thereby changed from realty to personalty, or from an undivided estate into an estate in severalty, until the value, in money or bond, has been actually paid or given, although the judicial proceedings under which the election had been made may have been, long before, finally terminated.(i)
In the case now under consideration the court is informed, by the bill, that the surplus of the proceeds of the sale of the real estate of the late Jesse Jones, yet remains in the hands of the sheriff, who made the sale, in obedience to a writ of fieri facias, which emanated from the Court of Appeals of the Eastern Shore; and further, that there has been no administrator appointed to take charge of the personal estate of the intestate Jesse Jones.
I feel perfectly satisfied, that the surplus in the hands of the late sheriff, who is now here as a defendant, must be regarded as personalty ; and as such belongs not to the heirs, but to the personal representative of Jesse Jones. But there is no such person here as a party to this suit; and, without such a party, I hold it to be impracticable, by any decree of this court, to affect this surplus ; which, as personalty, can only be called for from the hands of the personal representative of the intestate to whom it rightfully and exclusively belongs. For, although creditors may be allowed to proceed against the heirs alone, in respect to the real assets descended to them, where there is no administrator, or the personalty has been altogether exhausted; yet they certainly cannot be allowed, in this way, to obtain satisfaction of their claims from a merely personal fund, to which they direct the attention of the court, without making the administrator, who alone can be entitled to such fund, a party to the suit.
Supposing however, that an administrator of the late Jesse Jones was here as a party to this suit; even then, this defendant Brown, the late sheriff, as regards his possession of this surplus, must be *461 considered as an officer of the Court of Appeals. But can the Chancellor order money, which has been legally placed in the hands of an officer of the Court of Appeals, subject to their control, to be brought into this court, to be disposed of here as may be deemed right, among the parties to this suit ? This court might order an administrator, if there was such a person here as a party to this suit, to move the Court of Appeals to direct their officer, this sheriff, to pay this surplus to him the administrator. But the Chancellor can give no such direction to this sheriff; because in undertaking to control an officer of the Court of Appeals as to any disposition of money placed in his hands by their authority, the Chancellor would thus bring this court into direct conflict with the jurisdiction of that tribunal, which certainly ought not to be done in any manner or under any circumstances whatever. Money in the hands of a sheriff, or of a third person, cannot be taken under a fieri facias; and the correctness of this position generally is recognised by the attachment act,(j) which gives what is called a judicial attachment as against third persons. But even that process cannot be levied upon money which had been made, and brought into the hands of a sheriff by virtue of a writ of fieri facias ; because no third person or other court can be allowed to interfere with the execution of his duty according to the command of the process of that court under whose authority he was acting, (k) Hence it is clear, that this sheriff Brown has been improperly made a party to this suit.
Whereupon it is ordered, that this case stand over, with leave to amend and to make proper parties.
Afterwards on the 6th of June 1828, the plaintiffs filed in this case the following judgment or direction of the Court of Appeals.
“ Court of Appeals for the Eastern Shore of Maryland, June term 1828. — Ordered by the court, that Edward Brown, late sheriff of Kent county, pay to such trustee as the Chancellor of Maryland shall appoint, the sum of fourteen hundred and 'fifty-one dollars and thirty-eight cents, which sum of money the said Edward Brown as sheriff aforesaid, in his return upon a writ of fieri facias issued from this court at the suit of Thomas Dawson against Jesse *462 Jones, states to have remained in his hands after paying and satisfying the debt, damages, costs, and charges due upon the said fieri facias, and the taxes and fees due to him the said Edward Brown as late sheriff and collector of Kent county. The said sum of money being part of the real estate of the said Jesse Jones deceased. The Chancellor will distribute and dispose of the same as he shall deem equitable and proper.”
Upon all which this case was again brought before the court and submitted without argument.
9th June, 1828. — Bland, Chancellor. — Decreed, that in obedience to the order of the Court of Appeals for the Eastern Shore of Maryland, filed in this case on the sixth instant, the said sum of $1451 38, mentioned in the bill of complaint, be paid by the said Edward Brown to John B. Eccleston, the trustee herein after named; which money having been declared by the said order to be a part of the real estate of Jesse Jones deceased, when received by the said trustee he shall bring into this court to be .applied under the Chancellor’s direction, after deducting the costs of this suit, and such commission to the trustee as the Chancellor shall think proper to allow in consideration of the skill, attention, and fidelity wherewith he shall appear to have discharged his trust; that before the said trustee shall be entitled to receive the said sum of money, he shall file with the register of this court the bond herein after mentioned; that provided the said sum of money shall be paid by the said Edward Brown on or before the first day of January next, no interest thereon shall be demanded; but if not then paid he shall from that time be required to pay interest on the same.
It is further decreed, that the lands in the proceedings mentioned be sold, that John B. Eccleston be appointed trustee to make the sale, &c. &c.; and that the trustee at the time of advertising the said property for sale, give notice to the creditors of the said Jesse Jones to file the vouchers of their claims in the chancery office, within four months from the day of sale.
After which the trustee made sale of the real estate, which was ratified on the 13th of April 1829, and having received the surplus from the defendant Brown, and given notice to the creditors, who came in; the whole estate was finally distributed; after allowing to the two widows each a portion of the proceeds of the sale of the realty sold by the trustee in lieu of their dower.

 Charter of Maryland, s. 5 & 18; Gilb. Exch. 89.

 Gilb. Execu. 3.

 Pow. Mort. by Coven, c. 23, s. 9; Gilb. Exch. 93; Rorke v. Dayrell, 4 T. R. 410; Sug. Pow. 184.

 1650, ch. 28.

 The State v. Rogers, 2 H. & McH. 198; Hollingsworth v. Patten, 3 H. & McH. 125; Murray v. Ridley, 3 H. & McH. 171.
Birchfield for the King v. Brown. — This bill was filed in the year 1713 by Maurice Birchfield, surveyor general of the southern district of America, for and on behalf of the king against Joseph Brown, Margaret Brown, Richard Bennett, and Richard Smith, the representatives and debtors of Peregrine Brown late of London, merchant, to recover a debt due from the deceased to the crown. The case standing ready for hearing was brought before the court.
8th October, 1716. — Hart, Chancellor. — Decreed, that the several tracts of land hereafter mentioned be sold towards satisfying and paying his sacred majesty king George the debt in the bill mentioned to be due from the deceased Peregrine Brown; and that the sale may be made to the best advantage, notice be given of such sale to begin the 28th day of April next, and to continue till the 20th of May following. And that every purchaser of the same, or any part thereof, shall have, hold, and enjoy the same to him, or them, by a good and perfect estate in fee simple, in such manner as if the said Peregrine Brown had conveyed the same according to the exigence of the law: viz. Turkey Point, one thousand acres in Cecil county, &c. &c.
After which the case was again brought before the court under other circumstances.
3d September, 1717. — Hart, Chancellor. — Ordered, that the persons discovered to be debtors to the estate of Peregrine Brown deceased, particularly James Frisby and Peter Carmack, be made parties to the bill filed in this court by Maurice Birchfield on behalf of the crown against Joseph and Margaret Brown and others. And that the personal estate and several debts due to Peregrine Brown, and mentioned in the answer of Richard Bennett and Joseph Brown, be liable to the demand of the crown in such manner as they would be to Peregrine Brown.
Some time after Peter Carmack, who, with others, had, by a separate bill, been made a party, put in his answer thereto, in which, among other things, he stated, that the matter in controversy had been referred to the arbitration of certain persons, who had made an award thereupon discharging him; upon which award he relied.
13th July, 1723. — Tilghman, Chancellor. — It seems, that Maurice Birchfield negotiated the affair with Carmack, by way of arbitration, and was fully apprised of the state of the accounts betwixt Brown and Carmack, and seemed well satisfied therewith and with the award, and that Peregrine Brown was considerably in his, the said Carmack’s, debt. And it also seems, that Birchfield sues not in such manner as to entitle himself to the advantages due to the prerogative, nor agreeable to the statute of the thirty-third of Henry the eighth, chapter thirty-ninth, but rather as a common person, or assignee of a common person. It is therefore adjudged, ordered, and decreed, that the bill of complaint of the said Maurice Birchfield be dismissed, and that the said Maurice satisfy and pay unto the said Peter Carmack,
-pounds of tobacco for his costs sustained by reason of his unjust vexation in this part. — Chan. Records, Lib. P. L. 68, 317, 387, 392, 812, and 892; Kilty’s Rep. 75, 205.
This, and other similar cases which might be adduced from the records, shew, that the Court of Chancery of Maryland, before the revolution, was, in many instances, resorted to as a court of exchequer. And, in relation to debts due to the State, it may be well to recollect, that, according to the English law, not only the real and personal estate of a public debtor are liable to be taken in execution and sold for *447 the satisfaction of the debt, but that the State might also have, what is called, an extent in aid, or a process to be levied upon debts due from others to the public debtor to the fourth degree; thus taking in execution dioses in action, and bringing the debtors of the State’s debtor before the court to answer in a way similar to that of a garnishee under a foreign attachment. Gilb. Exche. ch. 12. Petersd. Abri. tit. Extent, B. The act of Congress of the 20th of April, 1818, ch. 78, s. 8, gives a similar right, as against corporations, to the United States. The United States v. Robertson, 5 Peters, 659

 March 1778, c. 9, s. 6; November 1787, c. 40.

 13 Ed. 1, c. 18.

 2 Inst. 394.

 Gilb. Execu. 37.

 29 Car. 2, c. 3, s. 14 & 15.

 5 Geo. 2, c. 7.

 Gilb. Execu. 14.

 Tidd, Pra. 915; Pow. Mort. by Coven. 275, 280, 515; Odes v. Woodward, 2 Ld. Raym. 850; Bragner v. Langmead, 7 T. R. 20; Docura v. Henry, 4 H. & McH. 480.

 Tidd, Pra. 915.

 Wilbraham v. Snow, 2 Saund. 47; Oades v. Woodward, 7 Mod. 94; Dr. Needham’s Case, 12 Mod. 5; Waghorne v. Langmead, 1 Bos. & Pul. 572; Robinson v. Tonge, 3 P. Will. 400.

 5 Geo. 2, c. 7.

 Barney v. Patterson, 6 H. & J. 182; Davidson v. Beatty, 3 H. & McH. 616.

 Sir William Harbert’s Case, 3 Co. 12; Winstead v. Winstead, 1 Hayw. Rep. 245; Beatty v. Chapline, 2 H. & J. 19.

 Gilb. Execu. 16 & 20.

 Davidson v. Beatty, 3 H. & McH. 616; Barney v. Patterson, 6 H. & J. 204.

 March 1778, ch. 9, s. 6.

 Davidson v. Clayland, 1 H. & J. 546.

 Davidson v. Clayland, 1 H. & J. 550.

 March 1778, ch. 9, s. 7.

 Pow. Mort. by Coven. 983; Bromley v. Goodere, 1 Atk. 75; Flanagan v. Flanagan, cited 1 Bro. C. C. 500; Banks v. Scott, 5 Mad. 493; Mackubin v. Brown, ante 410; Wright v. Rose, 2 Sim. & Stu. 323; Fenwick v. Laughlin, post 474.

 The State v. Krebs, 6 H. & J. 36.

 Leadenham v. Nicholson, 1 H. & G. 275; Hammond v. Stier, 2 G. & J. 81; Cary v. Taylor, 2 Vern. 302.

 Spurrier v. Spurrier, post 000; Iglehart v. Armiger, post 000.
Wells v. Roloson. — This bill, which was filed on the 12th of June 1815, states, that the late John Wells, by his last will, among other things, devised certain real estate to his children, as tenants in common; one of whom, Margaret, was to hold for life with remainder over to her children in fee; that Margaret had several children who are infants, and was then the wife of the defendant Richard Roloson; that the land was incapable of division ; and that a division could not be obtained because of the infancy of Margaret’s children. Prayer that the estate might be sold and the proceeds divided. The defendants answered, admitting the facts as stated.
20th July, 1816. — Kilty, Chancellor. — Let a commission be issued under the act to direct descents to persons to be named by the complainant.
After which the case standing ready for hearing, and being submitted, the bill, answer, exhibits, and return of the commissioners, together with all other proceedings having been by tire Chancellor read and considered; it was on the 31st of December 1816 decreed, that the real estate be sold, and that William Gwynn be the trustee for that purpose, &c. A sale was accordingly made and confirmed. On the 25th of August, 1817, the auditor reported a distribution of the proceeds of sale after deducting costs, &c.; in which he says, that he had divided the balance among the deceased’s children to be paid agreeably to his will, — that is, among others, to Caleb Davis and Mary his wife, one-sixth of the balance $963 86, and to Richard Roloson and Margaret his wife during her life, and thereafter to her children or their issue according to the deceased’s will, $963 86.
28d September, 1817. — Kilty, Chancellor. — Ordered, that the above statement as reported be confirmed, and the proceeds applied accordingly, with interest on the commission and dividends, in proportion as it has been or may be received.
After which the trustee, referring to this last order, prayed, that he might be authorized to pay the dividend awarded to Margaret and her children to the register, that the same might be applied, invested or paid over as to the court might appear just and most conformable to the will, of the said John Wells.
30th September, 1817. — Kilty, Chancellor. — The trustee is authorized to pay into this court, to the register thereof, the part of the proceeds of the sale mentioned in the above petition, to be deposited in the usual manner subject to the order of the court.
Which dividend having been brought into court accordingly, Margaret Roloson set forth, that she was willing and able to give good security; and thereupon prayed, that the dividend awarded to her might be paid over.
28th October, 1817. — Kilty, Chancellor. — On the application of Margaret Roloson the report of the auditor and the will of John Wells have been considered. A bond must be executed by Richard Roloson for tire payment of the sum, to wit, $963 86 to the children of Margaret Roloson or their issue after her death according to the will of John Wells. The penalty of the bond to be 2000 dollars.
Mary Davis by her petition states, that her husband Caleb died on the 14th of June 1817, without having received any part of the proceeds of sale; that she had been advised by the trustee to take out letters of administration on the estate of her *457 late husband, or to obtain an order from this court for the share awarded to her and her husband by the order of the 23d of September 1817; but that she conceived herself entitled, in her own right, to the whole share as one of the children of the testator.
13th February, 1818. — Kilty, Chancellor. — This petition of Mary Davis has been considered; and the trustee is thereupon authorized and directed to pay the sum allotted to Caleb Davis and Mary his wife to the said Mary Davis, with interest as prescribed in the order of September 23d, 1817.
Eoloson and wife by their petition alleged, that their share had been, as they were informed, paid by the trustee to the register, who they prayed, might be ordered to pay it over to them. To which petition was subjoined an order signed by Margaret, directing it to be paid over to Eichard her husband.
21sf February, 1318. — Kilty, Chancellor. — The parties should have known, that the money is deposited in bank and cannot be drawn by the register without the order of the court. If the petitioners elect to taire a part of the money, as an equivalent to the use of the whole for life, it must be so stated; and witnessed, as to Margaret Eoloson. The present petition and the order of Margaret Eoloson are in general terms for the dividend, and would not justify the payment of any part of the money. The allowance will be three-sevenths of the whole sum.
Eoloson and wife by their petition stated, that they elected to take a part absolutely instead of the whole for life, To which petition was subjoined a draft by Margaret, in favour of Eichard, which was witnessed by T. W. Griffith.
24i/i February, 1818. — Kilty, Chancellen'. — On the above application it is ordered, that the said E. and M. Eoloson be allowed three-sevenths of the sum allotted to them for life; which, out of $963 86, amounts to $412 8j, leaving a fraction of one fourth; and a check will be ordered for that sum; and $74 9S-J to E. Eoloson as guardian of the children; malting together the sum of $4S7 7 paid in by the trustee, and deposited. The further sums to be received applicable to the said allowance may be paid to the said E. Eoloson as guardian to the children by the trustee when received or brought into court, with interest according to the order on the auditor’s report.
David Wilson and Joseph Eead set forth that they were the sureties of Eichard Eoloson, that he had deceived them; and that they did not consider themselves safe; that they had made application to the Orphans Court to be discharged, and they thereupon prayed that the dividends awarded to the infants might not be paid to Eoloson.
7th Apnl, 1818. — Kilty, Chancellor. — In consequence of the application of D. Wilson and of J. Eead, the trustee is directed to pay any forther sum, that may be received, applicable to the allowance to E. Eoloson and wife and her children, into court for further order. A copy of this application and order to be sent to the trustee.
Adam Waltemeyer and Eachel his wife by their petition stated, that she was one of the children of Margaret Eoloson; and as such was one of those who, under the will of John Wells, was entitled to take after the death of Margaret. Upon which they prayed, that the one-sixth of the proceeds, to which Margaret was entitled for life, might be so invested as that the interest or profits only should be paid to her during her life, securing the whole to the use of her children after her death.
25th My, 1818. — Kilty, Chancellor. — On considering the proceedings in this suit, *458 and particularly the order of February 24th, 1818, allowing to R. and M. Roloson a certain portion of the sum reported instead of the use of the whole sum for life ; the proportion of A. Waltemeyer of the residue including interest paid in is found to be $142 56, for which sum a check in his favour will be ordered.
Margaret Roloson by her petition stated, that conceiving herself entitled, during her life, to the interest arising from one-sixth of the purchase money received from the sale of the property in the proceedings mentioned, or such part thereof as now remained in the chancery office, she prayed, that the same might be invested in some way for her exclusive use and benefit; so that she might during her life receive the interest thereof, notwithstanding her coverture, for her own separate, use; and not subject to the control of her husband, as she will receive no benefit whatever from it if paid to him.
24th February, 1820. — Kilty, Chancellor. — The petitioner is referred to the order of the 24th of February 1818, on her petition with her husband, by which a certain sum was allowed to him in lieu of her interest.

 1 Mad. Chan. 339; High. Lun. 60, 69.

 1800, ch. 67, s. 5; 1816, ch. 154, s. 9; 1828, ch. 26, s. 3; 1829, ch. 222.

 Chaplin v. Chaplin, 3 P. Will. 245.

 The State v. Krebs, 6 H. & J. 37.

 Jernegan v. Baxter, 6 Mad. 32.

 Baltzell v. Foss, 1 H. & G. 504; McCanthy v. Goold, 1 Ball & B. 389.

 1802, ch. 94; 1820, ch. 191, s. 20, 21, & 22; Jarrett v. Cooley, 6 H. & J. 258.

 Ridgely v. Iglehart, post.

 1715, ch. 40, s. 7; Parke’s His. Co. Chan. 274.

 Turner v. Fendall, 1 Cran. 133; Armistead v. Philpot, Doug. 231; Willows v. Ball, 2 New Rep. 376; Fieldhouse v. Croft, 4 East, 510; Knight v. Criddle, 9 East, 48; Stratford v. Twynam, Jac. Rep. 418; 1331, ch. 321.